J-S35033-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: R.G.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.G., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 926 MDA 2023 |

Appeal from the Decree Entered May 31, 2023
In the Court of Common Pleas of Huntingdon County Orphans' Court at
No(s): CP-31-OC-01-2023

| | | |
|---|---|---|
| IN RE: B.C.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF J.G., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 927 MDA 2023 |

Appeal from the Order Entered May 31, 2023
In the Court of Common Pleas of Huntingdon County Orphans' Court at
No(s): CP-31-OC-02-2023

| | | |
|---|---|---|
| IN RE: G.A.L.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.G., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 928 MDA 2023 |

Appeal from the Order Entered May 31, 2023
In the Court of Common Pleas of Huntingdon County Orphans' Court at
No(s): CP-31-OC-03-2023

J-S35033-23

| IN RE: R.W.D., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.G., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 929 MDA 2023 |

Appeal from the Decree Entered May 31, 2023
In the Court of Common Pleas of Huntingdon County Orphans' Court at
No(s): CP-31-OC-04-2023

BEFORE:    PANELLA, P.J., McLAUGHLIN, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                                    **FILED OCTOBER 20, 2023**

J.G. ("Mother") appeals from the May 31, 2023 decrees of the orphans'
court terminating her parental rights to her children, R.G.D., born in 2008,
B.C.D., born in 2011, G.A.L.D., born in 2015, and R.W.D., born in 2017
(collectively, "Children").  After careful review, we affirm the termination of
Mother's parental rights to Children.

Children first came to the attention of the Huntingdon County Children
and Youth Services Agency ("Agency") in March 2020 based upon concerns of
drug use by Mother and Children's father, R.W.D. II ("Father"), Mother and
Father's parenting abilities, and the general well-being of Children.  The
Agency also developed concerns related to domestic violence perpetrated by
Mother against Father.

_____

[*] Retired Senior Judge assigned to the Superior Court.

- 2 -

On July 12, 2021, the Agency filed applications for emergency protective custody of Children citing Father's report that Mother drove under the influence of alcohol with Father and three of the Children in the vehicle and that Mother also punched Father in the face.[1]  The applications were denied, but the orphans' court ordered Mother to be removed from the family home. On August 4, 2021, the Agency filed further applications for emergency protective custody after witnessing Mother's vehicle parked in the driveway of the family home.  Additionally, in early August 2021, Father threatened an Agency employee regarding the potential removal of Children from the home and he was found to be in possession of drugs upon his arrest for the threats.

The applications for emergency protective custody were granted on August 4, 2021.  Children entered foster care on that date, and they were placed in their current foster home in December 2021.  On August 13, 2021, Children were adjudicated as dependent.  As part of the adjudication orders, Mother was ordered to submit to random drug and alcohol testing, with failure to submit a sample being considered a positive result, complete drug and alcohol counseling, and complete an Agency approved parenting program. Adjudication Orders, 8/13/21, at 3-4.  The permanency plans established by the Agency required, *inter alia*, Mother to complete couples counseling with Father.  ***See, e.g.***, Permanency Plan (CP-31-DP-0000028-2021), 7/26/23, at

---

[1] The records in the dependency matters were incorporated into the records in the instant termination proceedings.  N.T., 4/6/23, at 2.

16.  The orphans' court also ordered Mother to participate in an "approved parenting assessment."  Permanency Review Orders, 8/26/22, at 6.

The Agency filed the petitions to involuntarily terminate Mother's parental rights on January 4, 2023.[2]  A hearing on the termination petitions was held on April 6, 2023, at which the Agency presented its case in full.  After the hearing, Mother initially agreed to voluntarily relinquish her parental rights to Children; however, she revoked her relinquishment several days later in a letter sent to the orphans' court.[3]  **See** Letter, filed 4/27/23.  Thereafter, the case proceeded to a second hearing on May 3, 2023, at which Mother testified.  On May 31, 2023, the orphans' court issued decrees involuntarily terminating Mother's parental rights to Children pursuant to Section 2511(a)(8) and (b) of the Adoption Act, 23 Pa.C.S. § 2511(a)(8), (b).  Mother filed timely notices of appeal of the decrees at each lower court docket.[4]  The appeals were then consolidated by this Court *sua sponte*.

---

[2] The orphans' court appointed legal interests counsel, as well as a separate guardian *ad litem*, to represent Children in the termination proceedings.  **See In re Adoption of K.M.G.**, 240 A.3d 1218, 1235 (Pa. 2020) (holding that appellate courts should engage in *sua sponte* review to determine if orphans' court appointed legal interest counsel to represent children in contested termination proceedings).

[3] On April 11, 2023, after a separate hearing, Father filed petitions to voluntarily relinquish his parental rights to Children, which the orphans' court approved in decrees entered the following day.

[4] Mother filed concise statements of errors complained of on appeal contemporaneously with her notices of appeal, as required by Pa.R.A.P. 1925(a)(2)(i).  On July 10, 2023, the orphans' court issued a statement pursuant to Pa.R.A.P. 1925(a), indicating that it was relying on its earlier May 31, 2023 opinion.

On appeal, Mother argues that the Agency did not prove that the conditions which led to Children's removal and placement in foster care continued to exist, as required by Section 2511(a)(8). Mother argues that, while she has an extensive history of drug abuse that led to Children's removal, her last positive drug test was on May 2, 2022. Mother asserts that she completed drug treatment in June 2022 and her only positive tests after that date were for buprenorphine and benzodiazepine, which she was prescribed. Mother contends that the orphans' court overlooked her completion of drug treatment and sobriety, which "show[s that] she is able to remedy the conditions which led to the initial placement of [C]hildren and that this drug use issue no longer exists." Mother's Brief at 14-15.

Mother maintains that, contrary to the concerns raised by the caseworker at the hearing, she has retained stability since completing the drug treatment program as she is now not using drugs and is living with her grandmother. She also observes that the pending criminal charges that were discussed at the hearing[5] all pertain to events that occurred prior to the removal of Children and thus predate her recent efforts to address the factors that led to the removal. Mother further notes that she completed one of the

---

[5] In November 2022, Mother was charged with endangering the welfare of children, corruption of minors, recklessly endangering another person, and furnishing drug-free urine related to events that occurred between May 1, 2018 and August 3, 2021. N.T., 4/6/23, at 37, 41-42. Children are the victims of at least the endangering the welfare of children charges. *Id.* at 42. Mother was briefly incarcerated following her arrest. *Id.* at 31; N.T., 5/3/23, at 6.

programs required of her by the Agency and she was not afforded an opportunity to restart other programs, including a parenting program, after she obtained sobriety.

We conclude that Mother has waived her sole appellate issue as a result of her failure to include the issue in her Rule of Appellate Procedure 1925 concise statements of errors complained of on appeal. *See* Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement . . . are waived."); *In re M.Z.T.M.W.*, 163 A.3d 462, 466 (Pa. Super. 2017) (noting, in the context of appeal from the termination of parental rights, that waiver for failure to include an issue in a concise statement "is mandatory, and this Court may not craft *ad hoc* exceptions or engage in selective enforcement"). Mother's concise statements, which were filed at each lower court docket, state as their sole issue: "Did the trial court abuse its discretion and fail to consider the best interests of the child by terminating the parental rights of the Mother?" Concise Statements, 6/30/23, ¶1. Mother does not mention in her concise statements the question of whether the Agency met its burden of proof to show that the "conditions which led to the removal or placement of [C]hild[ren] continue to exist," the issue she challenges on appeal. 23 Pa.C.S. § 2511(a)(8). Instead, the issue Mother preserved in her concise statements relating to the orphans' court's consideration of the "best interests" of Children relates to the separate consideration under Section 2511(a)(8) of whether "termination of parental rights would best serve the needs and welfare of the child," *id.*, and the required analysis under Section 2511(b) of whether

termination serves the "developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). Mother does not present a "needs and welfare" argument in her brief.[6] As the sole issue that Mother argues in her brief was not included in her concise statements, her issue is waived on appeal. Pa.R.A.P. 1925(b)(4)(vii); *M.Z.T.M.W.*, 163 A.3d at 466.

Nevertheless, we find that, even if Mother had preserved her appellate challenge to the issue of whether the conditions which led to the removal or placement of Children continued to exist as of the date of filing of the termination petition, this issue lacks merit. Our review is governed by the following precepts:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

---

[6] The statement of questions portion of Mother's brief also only indicates that she challenges the orphans' court failure to consider whether termination served the "best interests" of Children. Mother's Brief at 5. While an issue not set forth in the statement of questions is generally deemed waived, Mother's brief otherwise clearly indicates the issue she in fact sought to raise, and therefore we do not find waiver on this ground. *Werner v. Werner*, 149 A.3d 338, 341 (Pa. Super. 2016).

*In re J.R.R.*, 229 A.3d 8, 11 (Pa. Super. 2020) (quoting *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013)). The petitioner bears the burden of proving grounds for termination of parental rights by clear and convincing evidence, which is defined as "testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re L.W.*, 267 A.3d 517, 522 (Pa. Super. 2021) (citation omitted).

Pursuant to Section 2511 of the Adoption Act, the orphans' court must find that petitioner established grounds for termination of parental rights under one of the eleven enumerated grounds set forth in subsection (a) and the court must then proceed to assess the petition under subsection (b), which focuses on the child's needs and welfare. *In re Adoption of C.M.*, 255 A.3d 343, 359 (Pa. 2021). Here, the orphans' court terminated Mother's parental rights pursuant to Sections 2511(a)(8), and subsection (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> * * *

**(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(8), (b).

In order to satisfy Section 2511(a)(8), the petitioner must prove that: (1) the child has been removed from the parent's care for at least 12 months; (2) the conditions which led to the removal or placement still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child.[7] *In re Adoption of J.N.M.*, 177 A.3d 937, 943 (Pa. Super. 2018). Termination pursuant to Section 2511(a)(8) does not require an evaluation of a parent's willingness or ability to remedy the conditions that led to the removal or placement of the child. *Id.*; *In re Adoption of M.A.B.*, 166 A.3d 434, 446 (Pa. Super. 2017). Rather, the relevant inquiry is focused upon whether the at-issue conditions have been "remedied" such that "reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972

---

[7] There is no dispute that the Agency satisfied the first element of Section 2511(a)(8), that Children were removed from Mother's care for more than 12 months as of the date of the filing of the termination petition. 23 Pa.C.S. § 2511(a)(8). As discussed *infra*, we conclude that the Agency met its burden of proof as to the third element of subsection (a)(8) and under subsection (b). 23 Pa.C.S. § 2511(a)(8), (b).

A.2d 5, 11 (Pa. Super. 2009). The lower court may not give any consideration to efforts to remedy the conditions that gave rise to removal or placement that were initiated after the filing of the termination petition. 23 Pa.C.S. § 2511(b).

> This Court has acknowledged:
>
> [T]he application of Section (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. By allowing for termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit eighteen months, in which to complete the process of either reunification or adoption for a child who has been placed in foster care.

*I.J.*, 972 A.2d at 11-12 (emphasis and internal citations omitted).

Christi Shawley, an Agency caseworker, testified at the April 6, 2023 hearing regarding the Agency's concerns with Mother dating back to the Agency's first involvement with the family in March 2020, as well as the goals and services that were required of Mother for reunification with Children after their removal in August 2021. Shawley stated that the Agency's concerns for Mother were her "[d]rug use, lack of completion and cooperation with court-ordered services[,] and lack of stability." N.T., 4/6/23, at 25. With respect to Mother's drug use, Shawley stated that there were 33 completed or attempted drug tests of Mother, with 9 positive tests for illegal substances, 16

positive tests for only prescription drugs, 1 negative test, and 7 attempted tests when Mother was not home. *Id.* at 25-26. The 9 positive tests for illegal substances stretched from March 2021 to June 2022, and included such substances as alcohol, methamphetamines, fentanyl, and ecstasy. *Id.* at 26-30, 43. Mother also tested positive for buprenorphine and benzodiazepine, which she claimed to have been prescribed, although the Agency never received confirmation of her prescriptions. *Id.* at 29-31.

Shawley next testified as to Mother's failure to complete court-ordered services. Mother was scheduled for biweekly, supervised visits with Children, although her participation was inconsistent due to periods of incarceration and Mother's use of unprescribed drugs, with a positive result resulting in the cancelation of visits. *Id.* at 34-35. Mother also canceled on several occasions based upon lack of transportation, despite the fact that the Agency always provides transportation if sufficient notice is given. *Id.* at 35-36. Shawley described rule violations by Mother "at almost every single visit," including Mother inviting unannounced guests, talking to Children about the foster home, and whispering to Children during visits. *Id.* at 36. Mother was never able to proceed to unsupervised visits, and visitation was finally suspended in August 2022 at the request of Children's guardian *ad litem* ("GAL") due to emotional distress and other behavioral concerns around the time of the visits. *Id.* at 35, 47. Children's issues related to the visits included over or under eating, clingy behavior, anxiety, R.G.D. shutting herself in her room and refusing to attend the visits, and B.C.D. having nightmares. *Id.* at 48. At the

visits, Mother "struggled" to control Children, while R.G.D. was "very parentified" and would take over the role of disciplining the younger Children in place of Mother. *Id.* at 48-49.

Shawley testified that Mother failed to complete the required drug and alcohol assessment; she completed an initial intake but was then discharged on March 11, 2022. *Id.* at 31-32. Shawley stated that Mother completed a second intake on June 8, 2022 and a closing notice was then sent on November 23, 2022 due to lack of participation. *Id.* According to Shawley, Mother told her that "she didn't need" drug and alcohol counseling. *Id.* at 47; *see also* N.T., 5/3/23, at 11 (Mother confirming that she refused to participate in drug and alcohol counseling when requested to do so in August 2022). Shawley explained that Mother also failed to complete the required Proud to be a Parent program[8] and Mother and Father also failed to engage in couples counseling that was recommended based on their history of domestic violence. N.T., 4/6/23, at 31, 46. Shawley stated that Mother also failed to fulfill the Agency's reunification goal that she complete an attachment and bonding assessment, despite Shawley reminding Mother about this goal and providing Mother with the counselor's contact information on several

---

[8] Tammy Lucas, an educator with the Proud to be a Parent program, testified that it was "very difficult" to schedule Mother to attend sessions despite multiple voicemail messages that were left for her. N.T., 4/6/23, at 19-20. Mother eventually began the program in January 2022, completing 8 of 13 scheduled sessions, with 4 cancellations by Mother. *Id.* at 20-22. Ultimately, after Mother did not respond to an interest letter Lucas sent, Lucas closed Mother out of the Proud to be a Parent program on April 12, 2022. *Id.*

occasions.[9]  *Id.* at 32-33.  Mother did, however, complete the Hope parenting program in September 2022 after a "struggle" with attendance.  *Id.* at 31.

Upon careful review of the record, it is clear that there was competent evidence before the trial court to show, under the heightened standard of proof applicable in termination of parental rights cases, that the conditions which led to the removal of Children and their placement into foster care still existed as of the date of the filing of the termination petition.  While Mother did attain sobriety by June 2022, this does not compensate for her numerous other failings to address the conditions that led to Children's removal.  Mother did not submit to court-ordered drug and alcohol counseling—even though she was provided an opportunity to do so after becoming sober—as she felt she "didn't need" the program.  *Id.* at 47.  Mother also failed to engage in couples counseling, participate in the attachment and bonding assessment, or

_____

[9] Maddie Sell, the counselor who was retained to complete the attachment and bonding assessment, testified that she had to reach out multiple times to Mother in August and September of 2022 to schedule an appointment for the assessment and eventually was able to schedule a session for September 30, 2022.  N.T., 4/6/23, at 2-4.  However, on the morning of the assessment, Mother decided not to attend the appointment when Sell did not immediately respond to Mother's voicemail.  *Id.* at 4.  Sell made three additional attempts to reschedule with Mother, without success.  *Id.* at 4, 16-17.  Ultimately, after the termination petition was filed on January 4, 2023, Sell reached back out to Mother "as a courtesy," and Mother then agreed to two meetings with Sell.  *Id.* at 4-5; *see also* N.T., 5/3/23, at 9 (Mother agreeing that she did not meet with Sell until January 2023).  However, Sell could not fully complete the assessment of Mother because Mother did not submit to an adult attachment interview.  N.T., 4/6/23, at 5-6.

complete both of the required parenting programs.[10]  Mother further struggled with visitation of Children as she missed many visits due to unprescribed drug use, she failed to follow the rules on multiple occasions, and the visits were ultimately suspended due to emotional distress of Children.  We additionally note that, while Mother argues on appeal that she has achieved stability in her home life, this was contradicted by testimony of the caseworker that she did not have a consistent home over the 15 months between the removal of Children and the termination hearings "because it was back and forth between staying with [Father] and staying with" Mother's grandmother.  *Id.* at 46-47.

Accordingly, we conclude that Mother's challenge to the orphans' court finding that the Agency met its burden under Section 2511(a)(8) warrants no relief.  Although we acknowledge the commendable progress Mother by achieving the goal of sobriety, the orphans' court was not required to hold Children's lives "in abeyance" and sacrifice their "need for permanence and stability" while waiting for Mother to alleviate all the conditions that led to Children's removal and placement in foster care.  *I.J.*, 972 A.2d at 11-12 (citations omitted).

Finally, we note that, although Mother does not raise a challenge to this issue in her brief, the Agency met its burden under Section 2511(a)(8) and

---

[10] While the record demonstrates that Mother took steps to participate in the attachment and bonding assessment and to engage in drug and alcohol counseling after the termination petition was filed, the Adoption Act forecloses our consideration of such efforts.  23 Pa.C.S. § 2511(b).

Section 2511(b) by presenting clear and convincing evidence that termination of Mother's parental rights best served the needs and welfare of Children. 23 Pa.C.S. § 2511(a)(8), (b); *see also In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*) (addressing lower court's needs and welfare analysis finding even where not expressly challenged by parent). Pursuant to Section 2511(a)(8), the orphans' court must find that "termination of parental rights would best serve the needs and welfare of the child." 23 Pa.C.S. § 2511(a)(8). As we have explained,

> while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as pr[e]scribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*C.L.G.*, 956 A.2d at 1009.

Under Section 2511(b), the orphans' court must "give primary consideration to the development, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). "The emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability." *T.S.M.*, 71 A.3d at 267 (citation and quotation marks omitted); *see also In the Interest of K.T.*, 296 A.3d 1085, 1106 (Pa. 2023). The Section 2511(b) analysis is focused on the needs and welfare of the child over the concerns of the parent, and each child's particular developmental, physical, and emotional needs must be assessed on a case-by-case basis. *K.T.*, 296 A.3d at 1105; *In re Adoption of L.A.K.*, 265 A.3d

- 15 -

580, 593 (Pa. 2021). The lower court must consider "the emotional bonds between the parent and child," with the threshold for the bond inquiry being whether termination will sever a "necessary and beneficial relationship," such that the child could suffer "extreme emotional consequences" or "significant, irreparable harm." *K.T.*, 296 A.3d at 1109-10 (citation omitted); *T.S.M.*, 71 A.3d at 267. A court engaging in a Subsection 2511(b) inquiry must also consider, as appropriate, the child's need for permanency and length of time in foster care; the child's placement in a pre-adoptive home and whether there is a bond with the foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs. *K.T.*, 296 A.3d at 1113.

The testimony presented by the Agency at the April 6, 2023 hearing demonstrated that Children had little, if any, bond with Mother; that any harm caused by severance of what bond exists between Mother and Children would be offset by the strong bond that Children had with the foster parents who supported their developmental, physical, and emotional needs; and that Children expressed a preference to not be returned to Mother's care. Maddie Sell, a counselor who was accepted by the lower court as an expert in child attachment and bonding, testified that there was "chronic and severe attachment disruption" between Mother and Children based upon Mother's avoidant attachment parenting style as well as her drug use and that "the parents have disengaged from [C]hildren . . . and then in turn [C]hildren have disengaged from them." N.T., 4/6/23, at 7-8. When asked whether there was a bond between Mother and Children, Sell responded that she did not

believe a bond existed. *Id.* at 8. She stated that severing what little bond does exist would "certainly" have an "impact" because Children have experienced "a significant level of traumatic stress" from their upbringing but that impact would be "mitigated if [Children] were in an . . . environment that fostered [a] healthy secure attachment." *Id.*

Sell, who observed Children with the foster family, believed that Children's relationship with their foster parents was healthy and secure. *Id.* at 9-10. She noted that Children were "very excited to tell [her]" about the activities they were engaged in at their foster home. *Id.* at 10. Sell stated that all of the Children were aware that the attachment with their natural parents had been "severed." *Id.* at 8-9. R.G.D., the eldest, stated that she thinks termination of Mother and Father's parental rights is "a good thing" and that the foster parents were able to provide Children with the stability and structure that their natural parents could not. *Id.* at 15-16. The next eldest, B.C.D., also expressed to Sell a preference to stay with the foster parents. *Id.* at 16.

Shawley, the Agency caseworker, testified that she observes Children in the foster home at least once per month and that they have "natural" and "positive" relationships with their foster parents. *Id.* at 37-39, 45. The foster parents are attentive to Children's emotional needs and involve Children in various activities, such as wrestling, T-ball, cheerleading, and Boy Scouts. *Id.* at 39-40. Shawley has spoken with each of the four Children and confirmed that they "wish to stay where they're at" and that their relationship with the

foster parents is safe and stable. *Id.* at 39, 45, 49. According to Shawley, R.G.D. enjoys having freedom from acting in a parental role towards her younger siblings, as well as the opportunity to have a part-time job at a pizza parlor. *Id.* at 40, 49.

R.G.D. and B.C.D. expressed to Shawley that "the things that they were going through prior to placement were not okay and they did not feel safe and they don't ever want to live through that again." *Id.* at 45. Shawley further stated that Children have not expressed a desire to have contact with either Mother or Father, they do not miss their natural parents, and "even when they were first placed with the [foster parents], [Children] only ever asked about" Father. *Id.* at 45-46. R.G.D. stated to Shawley that "she's never had any type of relationship with" Mother. *Id.* at 46.

Children's GAL informed the orphans' court at the May 3, 2023 hearing that Children are flourishing in their foster home, highlighting the improvement of Children in that home, including that G.A.L.D. no longer requires an individualized education program. N.T., 5/3/23, at 13. The GAL stated that Children have a bond with their current foster family, and they do not want to return to living with their natural parents. *Id.* The GAL opined that it is in the best interest of Children that Mother's parental rights be terminated. *Id.* Children's legal counsel indicated to the court that he spoke with each of the four Children and that "their desire [is] to stay where they are, to not be reunited with" Mother. *Id.* at 14. Counsel further stated that Children are "well bonded with the foster parents." *Id.*

Therefore, the evidence additionally supports the orphans' court's finding that termination of Mother's parental rights to Children best served their needs and welfare under Section 2511(a)(8) and (b). As Mother has demonstrated no basis for overturning the appealed-from termination, we affirm the orphans' court's May 31, 2023 decrees.

Decrees affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/20/2023